**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **MARIANA BALDERRAMA**, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | **EP-25-CV-00214-KC** |
| | § | |
| **DEPLOYED SERVICES, LLC,** | § | |
| | § | |
| *Defendant*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently before the Court is Defendant Deployed Services, LLC's (DSL) "Motion to Compel Arbitration of Plaintiff's Claims" (ECF No. 4). Therein, pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq*., DSL moves the Court to stay the case and compel Plaintiff Mariana Balderrama to submit all of her claims to arbitration. The Honorable District Judge Kathleen Cardone referred the motion to the undersigned Magistrate Judge. For the reasons that follow, the Court GRANTS the motion.

## I.   BACKGROUND

The facts in this section of the Opinion are derived principally from an affidavit of Tod Stephens, a Director of DSL; a declaration of Natalie Stark, an Assistant Director of DSL's Human Resources Operations; a declaration of Danielle Leible, a Director of the Human Resources Information System of Deployed Resources, LLC (a DSL-related entity); the documents submitted by Stark and Leible; and two affidavits of Balderrama.[1]

---

[1] DSL submitted Stephens's affidavit with its motion, *see* Stephens Aff., ECF No. 4-1, Stark's declaration with its reply brief, *see* Stark Decl., ECF No. 6-1, and Leible's declaration in response to the Court's Interim Order, *see* Leible Decl., ECF No. 20. Balderrama submitted her first affidavit with her response to DSL's motion, *see* Balderrama Aff. [hereinafter Balderrama 1st Aff.], ECF No. 5-1, and the second affidavit in response to the Court's Interim Order, *see* Balderrama Aff. [hereinafter Balderrama 2nd Aff.], ECF No. 21. After the parties completed briefing on the motion, including Balderrama filing a

DSL, a Nevada company, provides human care, facilities, and turnkey services, and its clients include U.S. Customs and Border Protection (CBP), to whom DSL provides its services under federal contracts.[2]  DSL operates throughout the United States, including in Texas, Arizona, California, and North Carolina.[3]  Balderrama worked for DSL from September 13, 2024, to October 24, 2024,[4] as a housekeeping and laundry aide at DSL's El Paso facility, where DSL's subcontract with CBP is performed.[5]  In June 2025, Balderrama brought this lawsuit against DSL, asserting claims for disability discrimination and retaliation in violation of the Americans with Disabilities Act and the Texas Commission on Human Rights Act.[6]

DSL conducts its hiring through a computerized recruiting system.[7]  In order to apply for a position at DSL, an applicant must create a profile on DSL's recruiting system, which is accessible through the "career" page of DSL's website or a job board.[8]  Creating the profile requires the applicant to provide an email address and to set login information for accessing the

---

sur-reply, the Court issued the Interim Order requesting clarifications on certain statements made in the affidavits and declaration submitted by the parties at the time, further factual information, and further documentary evidence.  *See* Interim Order at 2–5, ECF No. 19.

[2] Stephens Aff. at ¶¶ 2–3; Stark Decl. at ¶ 5; Leible Decl. at ¶ 2.

[3] Stephens Aff. at ¶ 3.

[4] *Id.* at ¶ 4.  According to Balderrama, she began working for DSL "[o]n or about September 15, 2024."  Balderrama 1st Aff. at ¶ 3.

[5] Stephens Aff. at ¶ 4; Report of Parties' Planning Meeting at § III. B, ECF No. 11.

[6] Pl.'s Original Compl. at ¶ 32, ECF No. 1.

[7] Leible Decl. at ¶¶ 6–7.  Stark and Leible refer to DSL's system(s) as "system," "recruiting system," and "Recruiting/Onboarding system."  *Id.* at ¶¶ 4, 6, 8; Stark Decl. at ¶ 6.  These systems operate in tandem with DSL's comprehensive human capital management platform, UKG Pro.  Leible Decl. at ¶¶ 6. 8.  Throughout this Opinion, the Court refers to them collectively as DSL's "recruiting system" or "system."

[8] Leible Decl. at ¶¶ 6, 8.

profile: a username, which can be his email address, and a password.[9]  DSL's recruiting system uses the applicant-provided email address as the applicant's primary identifier, and prior to the applicant's start date, DSL communicates with the applicant exclusively through that email address.[10]

After an applicant is offered a position and he accepts the offer, DSL sends the new hire an email with a link to access an "onboarding" packet.[11]  The packet contains a number of documents and forms that he must review, sign, or complete as a condition of employment: for example, CBP federal vetting process notice (regarding a provisional vetting process that determines whether a new hire would be permitted to work on site until a full background check is completed by CBP), Department of Homeland Security (DHS) non-disclosure agreement, confidentiality agreement, Fair Credit Reporting Act disclosure, EEO policy, code of conduct, 401K participant notice, IRS Form W-4—and arbitration agreement.[12]  Each document is viewable during the onboarding session.[13]  Only after the new hire signs and completes these documents and has been provisionally approved by CBP to work on site, DSL issues the new hire a start date.[14]

---

[9] Stark Decl. at ¶ 6; Leible Decl. at ¶ 8.

[10] Leible Decl. at ¶ 8.

[11] Stark Decl. at ¶¶ 5–6; Leible Decl. at ¶ 8; *see also* Def.'s Reply in Supp. of Its Mot. to Compel Arb. of Pl.'s Claims [hereinafter Def.'s Reply] at 2, 4, ECF No. 6.

[12] Stark Decl. at ¶¶ 4–5; Leible Decl. Ex. A, at 14–15, ECF No. 20.  Citations to the exhibits that DSL submitted through Stark's and Leible's declarations refer to the page numbers imprinted on the exhibits by the Court's Case Management and Electronic Case Filing system.

[13] Leible Decl. at ¶ 4.

[14] Stark Decl. at ¶ 4.

A new hire can only access the onboarding packet by logging into DSL's recruiting system using the profile he created and with the username and password he set.[15]  During the onboarding session, when the new hire reviews and signs an onboarding document, the system records the new hire's username, his IP address, the title or description of the document, the action taken by the new hire (such as "viewed" or "signed"), and the date and time the action was taken.[16]

In May 2024, Balderrama created her profile on DSL's recruiting system.[17]  On August 12, 2024, she applied for a housekeeping position at DSL, and on the following day, she was hired for that position.[18]  On August 14, 2024, DSL sent Balderrama an email with a link to her onboarding packet, and the email notified her that "You will be provided your start date once your paperwork is complete and your background is cleared."[19]

According to a report generated by DSL's recruiting system, Balderrama began completing the onboarding paperwork on August 16, 2024, at 10:36:11 AM MDT.[20]  She signed the arbitration agreement on August 16, 2024, at 2:20:26 PM MDT.[21]  She finished the

---

[15] *Id.* at ¶ 6.

[16] *Id.* at ¶¶ 4, 8; Stark Decl. Ex. A, at 9–13, ECF No. 6-1,

[17] Leible Decl. at ¶ 6; *see also* Leible Decl. Ex. E, at 37 (a printout of Balderrama's application from DSL's recruiting system as evidenced by the URL address printed at the bottom of the printout, https://dservices.rec.pro.ukg.net/DEP1002DEPS/recuiter/CandidateDetail?candidateId= . . . . ) (bearing the notation that "Created by Mariana Balderrama 05/14/2024"), ECF No. 20; *but see* Balderrama 2nd Aff. at ¶ 10 (stating that she created the profile on August 13, 2024).

[18] Leible Decl. at ¶ 6; Leible Decl. Ex. E, at 37, 44, 46.

[19] Stark Decl. at ¶ 6; Leible Decl. at ¶¶ 4–5; Leible Decl. Ex. A, at 12; Def.'s Reply at 2, 4.

[20] Stark Decl. at ¶ 7; Stark Decl. Ex. A, at 13; *see also* Stark Decl. at ¶ 4 (testifying that the records reflecting the onboarding process are "updated automatically as new hires interact with these documents").

[21] Stark Decl. at ¶ 7; Stark Decl. Ex. A, at 9.

onboarding process on August 16, 2024, at 2:56:58 PM MDT, after uploading a copy of her ID, and then uploading a copy of her Social Security card.[22]

The arbitration agreement, entitled "Mutual Agreement to Arbitrate Claims" (MAAC), provides:

> The Company and Employee agree that any claim, dispute, and/or controversy between Employee and Company ("Claims") related to or arising out of Employee's employment . . . or termination of employment, must be resolved by arbitration instead of the courts, and the parties mutually waive their right to a trial before a judge or jury in federal or state court in favor of arbitration under this Agreement.[23]

The MAAC defines "Claims" as follows: "Claims include, but are not limited to, . . . claims for harassment or discrimination (including, but not limited to, race, religion, national origin, age, marital status, medical condition, handicap, disability or other protected characteristic under applicable discrimination law)," including claims under "the Americans with Disabilities Act . . . and all comparable laws."[24]

On the last page of the MAAC appears the following text: "I UNDERSTAND AND AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT BY CLICKING THE SIGNATURE LINE BELOW AND ADDING MY ELECTRONIC SIGNATURE."[25] Below that text appears the following completed signature block.[26]

---

[22] Stark Decl. at ¶ 7; Stark Decl. Ex. A, at 9.

[23] Stark Decl. Ex. B, at 16, ECF No. 6-1. The MAAC defines "Company" as DSL and "Employee" as "the undersigned employee." *Id.*

[24] *Id.*

[25] *Id.* at 20.

[26] *Id.*

First Name: Mariana

Last Name: Balderrama

Email Address: balderrama.mariana@gmail.com

Signature: Mariana Balderrama          Electronically Signed By

Date: 8/16/2024

## II.  DISCUSSION

Relying on the MAAC, DSL argues that Balderrama's claims should be referred to arbitration and this case should be stayed.  Def.'s Mot. Compel Arb. of Pl.'s Claims at 7 [hereinafter Def.'s Mot.], ECF No. 4.  Balderrama denies having signed the MAAC, Pl.'s Resp. to Def.'s Mot. Compel Arb. at 9 [hereinafter Pl.'s Resp.], ECF No. 5, and argues that she has produced additional testimonial evidence supporting her denial, Pl.'s Sur-Reply to Def.'s Reply at 5 [hereinafter Pl.'s Sur-Reply], ECF No. 10.  She contends that there is a fact dispute regarding the formation or validity of the MAAC and asks the Court to hold a jury trial on DSL's motion.  *Id.* at 5–6.

The FAA provides that arbitration agreements in contracts "involving commerce" are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.[27]  As relevant here, § 4 of the FAA directs the court to:

---

[27] The parties do not dispute that the FAA applies here.  *See* Def.'s Mot.at 5 (arguing that "the FAA requires arbitration in this case"); Pl.'s Sur-Reply at 5–6 (citing 9 U.S.C. § 4); *see also Lopez v. Cintas Corp.*, 47 F.4th 428, 431 (5th Cir. 2022) (The FAA applies to contracts "evidencing a transaction involving commerce," and employment contracts—except those of seamen, railroad employees, and transportation workers—fall within that category.).

hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not *in issue* . . . make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement . . . be *in issue*, the court shall proceed summarily to the trial thereof.

*Id*. § 4 (emphasis added). "Where such an issue is raised, the party alleged to be in default may . . . demand a jury trial of such issue." *Id.*; *see also Am. Heritage Life Ins. v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002) ("Although the FAA permits parties to demand a jury trial to resolve factual issues surrounding the making of an arbitration agreement, . . . it is well-established that a party to an arbitration agreement cannot obtain a jury trial merely by demanding one." (cleaned up)).

Whether a party may be compelled to arbitrate involves two analytical steps: (1) whether there is a valid agreement to arbitrate, and (2) whether the dispute falls within the scope of that agreement. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018). Here, only the first step is at issue. To determine whether there is a valid arbitration agreement, "courts apply ordinary state-law principles that govern the formation of contracts." *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (internal quotes omitted). Here, the parties agree that Texas law applies.[28]

Where the parties dispute the validity of the arbitration agreement, the party moving to compel arbitration must show that "the agreement meets all of the requisite contract elements." *Yanez v. Dish Network, L.L.C.*, 140 F.4th 626, 630 (5th Cir. 2025). To put the making of the arbitration agreement "in issue," and therefore, to receive a jury trial on the issue, the non-movant must make "at least *some showing* that under prevailing law, he would be relieved of his contractual obligations to arbitrate if his allegations proved to be true" and must "produce *some*

---

[28] *See* Def.'s Mot. at 6; Pl.'s Resp. at 1–2.

*evidence* to substantiate his factual allegations." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992) (emphasis added).[29]

## A.  Requisite Formation of the MAAC

Under Texas law, the elements of contract formation are: "(1) an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).  In a given case, one or more of these elements may turn on whether a party signed the contract at issue.  *See Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013) ("Typically, a party manifests its assent by signing an agreement."); *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 210 (Tex. 2021) (concluding that the employer "established that the [e]mployees signed, and therefore consented to, the [arbitration agreement]"); *Huckaba*, 892 F.3d at 689 ("As to the [fifth] element, whether a signature is required to bind the parties is a question of the parties' intent.").[30]

---

[29] Recently, the Fifth Circuit has said, "[a]lthough this 'some evidence' standard may appear similar to the summary judgment standard predominant in our sister Circuits, we need not—and do not—decide whether the 9 U.S.C. § 4 standard in this Circuit is congruent with the summary judgment evidentiary standard of Rule 56." *Gallagher v. Vokey*, 860 F. App'x 354, 357 (5th Cir. 2021).  "That well-known summary-judgment evidentiary standard includes whether there are genuine disputes of material fact." *Soni v. Solera Holdings, L.L.C.*, No. 21-10428, 2022 WL 1402046, at *3 (5th Cir. May 4, 2022) (citing Fed. R. Civ. P. 56(a)).

[30] *See also W. Techs., Inc. v. Omnivations II, L.L.C.*, 583 S.W.3d 786, 793 (Tex. App.—El Paso 2019, no pet.) ("The presence or absence of a signature is some evidence of intent related to contract formation, and parties can condition acceptance of the contract on the presence of a valid signature, digital, or otherwise."); *Lujan v. Alorica*, 445 S.W.3d 443, 448 (Tex. App.—El Paso 2014, no pet.) ("Relevant to our determination of whether a binding contract exists is the presence or absence of signatures on a written contract.").

Under Texas Uniform Electronic Transactions Act (UETA),[31] an electronic signature holds the same validity as a handwritten, wet-ink signature. *See* Tex. Bus. & Com. Code Ann. § 322.007(a) (A "signature may not be denied legal effect or enforceability solely because it is in electronic form."). An electronic signature is "attributable" to a person "if it was the act of the person." *Id.* § 322.009(a). And the act of the person "may be shown *in any manner*, including a showing of the *efficacy* of any *security procedure* applied to determine the person" during the electronic transaction. *Id.* (emphasis added). The UETA defines "security procedure" as any "procedure employed for the purpose of verifying that an electronic signature . . . is that of a specific person," including "a procedure that requires the use of algorithms or other codes, identifying words or numbers, encryption, or callback or other acknowledgment procedures." *Id.* at § 322.002(13).

> Thus, as the Texas Supreme Court has explained, security procedures may include:
>
> requiring personal identifying information—such as a social security number or an address—to register for an account; assigning a unique identifier to a user and then tying that identifier to the user's actions; maintaining a single, secure system for tracking user activities that prevents unauthorized access to electronic records; business rules that require users to complete all steps in a program before moving on or completing it; and timestamps showing when users completed certain actions.

*Aerotek*, 624 S.W.3d at 205–06 (footnotes omitted). "In a contest to the validity of an electronic signature and whether it is attributable to an individual, the focus is on the efficacy of the

---

[31] "The purpose of the UETA and the public policy of Texas is to facilitate electronic transactions." *Thang v. Defy Int'l, LLC*, 712 S.W.3d 647, 664 n.5 (Tex. App.—Houston [14th Dist.] 2025, no pet.). In deciding whether to compel arbitration under the FAA, the federal district courts in Texas have applied the UETA. *See, e.g.*, *Lambert v. Leidos, Inc.*, No. 4:24-CV-00911-P, 2025 WL 242247, at *2 (N.D. Tex. Jan. 16, 2025); *Abebe v. Yum! Brands, Inc.*, No. 4:23-CV-682, 2024 WL 3891357, at *6 (E.D. Tex. Aug. 21, 2024); *Hearn v. Uber Techs., Inc.*, No. CV H-21-3465, 2022 WL 20691054, at *4 (S.D. Tex. May 27, 2022); *Mayton v. Tempoe, LLC*, No. SA-17-CV-179-XR, 2017 WL 2484849, at *3 (W.D. Tex. June 7, 2017); *see also Romero v. Watkins & Shepard Trucking, Inc.*, No. 20-55768, 2021 WL 3675074, at *1 (9th Cir. Aug. 19, 2021) (relying on similar California and Nevada laws in deciding whether the parties formed a contract to arbitrate for purposes of the FAA).

security procedures applied in the electronic transaction." *Rush Truck Centers of Tex., L.P. v. Mendoza*, 676 S.W.3d 821, 827 (Tex. App.—El Paso 2023, pet. denied).

In her brief in response to DSL's motion, Balderrama argues that DSL has not produced evidence to establish the efficacy of the security procedures utilized to ensure that it was her and no one else who electronically signed the MAAC. Pl.'s Resp. at 4, 8. For this reason, she says, DSL has failed to meet its burden to prove the existence of a valid arbitration agreement. *Id.* at 2–3; *see also id.* at 2–8. In reply, DSL submitted Stark's declaration together with two exhibits: the system-generated report that recorded Balderrama's interactions with the onboarding packet (Exhibit A)[32] and the MAAC bearing Balderrama's electronic signature and date stamp (Exhibit

---

[32] The Court observes that in response to its Interim Order, DSL submitted the report a second time via Leible's declaration, Leible Decl. Ex. B, ECF No. 20, and Balderrama objects to this report for lack of proper authentication, Pl.'s Suppl. Br. Responding to Ct.'s Interim Order at 2–5, ECF No. 23. The record reflects that Balderrama does not raise any evidentiary challenge to the report proffered through Stark's declaration. *See generally* Pl.'s Sur-Reply. Stark's declaration, which provides greater details about the report than does Leible's declaration, supports a finding that the report as attached to Stark's declaration is a self-authenticating business record. *See* Fed. R. Evid. 902(11) (A "copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person," is "self-authenticating.").

Specifically, Stark, who, as mentioned, is an Assistant Director of DSL's Human Resources Operations, testifies that she is familiar with and has access to DSL's records of its onboarding process that reflect the identity of the new hires who log into DSL's system to view and sign the onboarding documents, along with the new hire's username, his IP address, the title or description of the document, the action taken by the new hire—such as "viewed," "signed," or "uploaded"—with respect to the document, and the date and time of the action. Stark Decl. at ¶ 4. The report in Stark's Exhibit A fits this description of DSL's onboarding records. Stark Decl. Ex. A, at 9–13. Stark testifies that these records are updated automatically as new hires interact with the onboarding documents: For example, she illustrates, at the time the new hire views an onboarding document, an electronic receipt is generated showing that he viewed the document and a date- and time-stamp indicating when he viewed it, and if the new hire signs the same document he just viewed, a second receipt is generated showing that he signed the document and a date- and time-stamp indicating when he signed it. Stark Decl. at ¶ 4. She adds that these records are maintained in the regular course of DSL's business and are records of regularly conducted activity. *Id.* She certifies that Exhibit A attached to her declaration is a true and correct copy of the report generated regarding Balderrama's interactions with the onboarding packet. *Id.* at ¶ 7.

Consequently, for purposes of this motion, the Court is satisfied that the report of Balderrama's onboarding interactions attached to Stark's declaration as Exhibit A is a self-authenticating business record. *Cf. United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) (concluding that Yahoo!'s email transmittal records satisfied Rule 803(6)'s requirements for admission, where Yahoo!'s records-custodian

B).  DSL argues that this evidence establishes the effectiveness of the security procedures utilized with respect to Balderrama's electronic signature.  Def.'s Reply at 3–6.

Specifically, DSL's evidence shows the following.  Balderrama could only access the onboarding packet by logging into DSL's recruiting system using the profile that she created on the system.[33]  Only Balderrama knew her profile login information, that is, her username and password, and DSL did not have access to her login information during her onboarding process.[34]  If Balderrama had not signed and completed each document in the onboarding packet, she would not have started work with DSL.[35]  Before DSL could give Balderrama a start date, CBP had to give provisional approval for her to work on DSL's El Paso site while her background check was being completed, and in order for her information to be submitted to CBP to begin the vetting process, Balderrama was required to sign and complete all onboarding documents, including the MAAC.[36]  If she had not signed the MAAC, the onboarding process would not have proceeded.[37]  DSL's recruiting system automatically recorded Balderrama's

---

stated that Yahoo! recorded the transmittal data automatically when users send emails, as part of the regular practice of a regularly conducted business activity); *United States v. Cameron*, 699 F.3d 621, 632, 641 & n.10 (1st Cir. 2012) (concluding that Yahoo!'s Account Management Tools and its Login tracker were Yahoo!'s business records under Rule 803(6), where a qualified witness of Yahoo! testified that Yahoo! automatically recorded the data in the Account Management Tool and the Login Tracker in the regular course of its business).

[33] Stark Decl. at ¶ 6.

[34] *Id.*  The username becomes known to DSL after the completion of the onboarding process.  *See* Stark Decl. Ex. A, at 9–13 (onboarding report) (listing Balderama's email address under the "USERNAME" column); Stark Decl. at ¶ 6 ("Ms. Balderrama provided her email address as her User Name in the user profile she created.").

[35] Stark Decl. at ¶¶ 5, 9.

[36] *Id.* at ¶ 9.

[37] *Id.*

actions during the onboarding process—such as "viewed," "signed," or "uploaded"—and date- and time-stamped her actions.[38]  DSL has produced the click-signed MAAC marked with Balderrama's name and date stamp in its signature block,[39] and the MAAC's date stamp is identical to the date stamp on the onboarding report reflecting when Balderrama signed the MAAC.[40]  Finally, after Balderrama viewed and signed the onboarding documents, DSL does not have the ability to change the documents; it can only download a document as signed by Balderrama.[41]

In her sur-reply, Balderrama does not make any mention of security procedures, much less address DSL's reply-brief arguments.  Based on similar evidence as DSL has presented here, Texas courts have found that employers, who moved to compel arbitration, established the efficacy of the security procedures of their electronic onboarding processes.  *See Aerotek*, 624 S.W.3d at 206, 209; *Rush Truck Cntrs.*, 676 S.W.3d at 827–30.[42]  The Court finds that DSL has

---

[38] *Id.* at ¶ 4, 7; Stark Decl. Ex. A, at 9–13.

[39] Stark Decl. at ¶¶ 7–8; Stark Decl. Ex. B, at 16–20.

[40] *Compare* Stark Decl. Ex. B, at 20 ("Date: 8/16/2024"), *with* Stark Decl. Ex. A, at 9 (showing that "Arbitration Agreement" was viewed and signed on "8/16/2024" at 20:20 (UTC)).

[41] Stark Decl. at ¶ 8.

[42] In *Aerotek*, the court summarized the employer's evidence as follows:

To enter the [the employer's hiring] application, a candidate was required to create for himself a unique identifier, a user ID, a password, and security questions, all unknown to [the employer].  The candidate was required to enter personal information and sign documents by clicking on them.  The application recorded and timestamped the candidate's every action.  The application's business rules made it so that the application could not be submitted until all steps were completed and all required signatures provided, including on the [arbitration agreements].  Once a candidate submitted his application, [the employer] could not modify its contents.  [The employer] provided the signed [agreements] marked with timestamps identical to those in its database records showing each [e]mployee's progress through the application.

produced sufficient evidence to establish the efficacy of the security procedures that DSL's

recruiting system utilized and in turn, that the electronic signature on the MAAC is that of

Balderrama. *Aerotek*, 624 S.W.3d at 210 ("[P]roof of the efficacy of the security procedures

used in generating a contract can prove that an electronic signature is attributable to an alleged

signatory."). Consequently, the Court agrees with DSL that it has carried its burden to show that

the MAAC meets all of the requisite contract elements. *See* Def.'s Mot. at 6–7 (arguing, *inter*

*alia*, that the MAAC contains sufficient consideration in the Company and Employee's mutual

promises to arbitrate Claims); Stark Decl. Ex. B, at 16, 20; *see also Nelson v. Watch House*

*Intern., L.L.C.*, 815 F.3d 190, 193 (5th Cir. 2016) ("[A] mutual agreement to arbitrate claims is

sufficient consideration to support an arbitration agreement.").

## B.  Requisite Some Showing and Some Evidence

Next, "'where competent evidence showing the formation of an agreement to arbitrate

has been presented,' the non-moving party must 'produce *some* contrary evidence to put the

matter 'in issue.'" *Yanez*, 140 F.4th at 630 (emphasis in original) (quoting *Gallagher*, 860 F.

App'x at 357–58); *see also* 9 U.S.C. § 4.  Specifically, the non-moving party is "required to both

'unequivocally deny that [s]he agreed to arbitrate and produce 'some evidence' supporting h[er]

position.'" *Yanez*, 140 F.4th at 630 (brackets omitted) (quoting *Chester v. DirecTV, L.L.C.*, 607

---

*Aerotek*, 624 S.W.3d at 206.  Based on this evidence, the court concluded that the employer "proved [the] security procedures" its hiring application used to verify that the employees electronically signed their agreements. *Id.* at 209.

And in *Rush*, the employer produced the following evidence: the employee logged into the employer's electronic onboarding system using his username and password, which he created; only the employee could access his account; the employer did not have the ability to access the employee's account; the system automatically dated and saved the time the employee signed the arbitration agreement; the employee's electronic signature on the arbitration agreement was date-stamped; and the date on the agreement matched the date on the electronic records summary showing when the employee viewed and electronically signed the agreement. *Rush Truck Cntrs.*, 676 S.W.3d at 828–29.  Based on this evidence, the court concluded that the employer established the efficacy of security procedures its electronic onboarding system utilized in the transaction. *Id.* at 827, 830.

F. App'x 362, 364 (5th Cir. 2015)); *see also Soni*, 2022 WL 1402046, at *3 (The "'some showing' standard requires: unequivocally denying entering the contract[] and producing evidence sufficient to substantiate that allegation." (internal citation omitted)); *cf. also Aerotek*, 624 S.W.3d at 208 (rejecting the proposition that "merely denying an electronic signature qualifies as some evidence in showing an electronically signed arbitration agreement's invalidity").

Here, Balderrama variously denies that she electronically signed the MAAC on August 16, 2024.[43] She makes three attempts to support her denial.

First, she testifies that she electronically signed "documents for the onboarding process" on September 11, 2024, on a computer at DSL's office in El Paso.[44] Thus, she suggests that she could not have completed her onboarding process and electronically signed the MAAC on August 16, 2024, as DSL's evidence shows.[45] DSL avers that it does not have a record of Balderrama signing any documents on September 11, 2024. Def.'s Suppl. Br. Pursuant to Ct.'s Interim Order at 2, ECF No. 22. In response to the Court's questions, *see* Interim Order at 4–7, Balderrama states that she does not have any copies of the documents that she signed on September 11, 2024, and does not recall the title of the documents—though she recalls that the

---

[43] Pl.'s 1st Aff. at ¶ 5 ("I recall that I never signed the document titled 'Mutual Agreement to Arbitrate Claims.'"); *id.* at ¶ 6 ("I did not electronically sign this document."); *id.* at ¶ 7 ("I never signed the document titled 'Mutual Agreement to Arbitrate Claims' on August 16, 2024[,] or any other day."); *see also id.* at ¶ 5 ("I never saw the document titled 'Mutual Agreement to Arbitrate Claims' until after the document was filed in the above-referenced case.").

[44] *Id.* at ¶ 6; Pl.'s 2nd Aff. at ¶¶ 5–7.

[45] Stark Decl. at ¶ 7; Stark Decl. Ex. A, at 9.

documents asked her to provide her employment history, education history, and a list of her prior addresses, as well as to state whether she had or previously had a disability.[46]

As reflected in Balderrama's onboarding report[47] and Stark's description of the "onboarding packet,"[48] DSL's onboarding process required Balderrama to: (a) review and sign certain documents, such as CBP federal vetting process notice and Fair Credit Reporting Act disclosure (on the report, they are marked as "viewed" and "signed");[49] (b) upload certain documents such as her Social Security card and ID (on the report, they are marked as "uploaded"),[50] and (c) complete certain forms such as disability status form (Form CC-305), Form W-4, direct deposit form, and "Bird & 77" form (on the report, they are marked as "updated").[51]  Next to each of the updated-type forms, the report displays what specific information she was asked (and the responses she provided unless they are private information such as her Social Security number which are redacted as "****"): for example, the "Bird & 77" form asked, among other questions, about her citizenship and residency.[52]

As important, none of these onboarding documents or forms asked about any employment history, education history, or address history.  And while the disability status form asked, "Do you have a disability?" it did not ask whether she previously had a disability.[53]  To be

---

[46] Pl.'s 2nd Aff. at ¶ 8.

[47] Stark Decl. Ex. A, at 9–20.

[48] Stark Decl. at ¶¶ 4–5.

[49] Stark Decl. Ex. A, at 9.

[50] *Id.*

[51] *Id.* at 10, 12.

[52] *Id.* at 10.

[53] *Id.* at 12 (asking "Are you a US Citizen?" and "Do you have a permanent resident card?").

sure, she was required to provide her employment history and education history, and answer a disability-related question on the online job application that she previously submitted on August 12, 2024.[54]  It appears to the Court that whatever documents Balderrama signed on September 11, 2024, were separate and apart from the documents for DSL's onboarding process as reflected and described in DSL's evidence.

At best, Balderrama's views of what constitutes an "onboarding process" and what documents are part of that process—as when she testifies that she electronically signed "documents for the onboarding process" on September 11, 2024—differ from DSL's description and understanding of its "onboarding process" and "onboarding packet," which included the MAAC.  The Court finds that Balderrama's testimony is insufficiently probative of her claim that she did not electronically sign the MAAC on August 16, 2024.

Second, she testifies that she did not electronically sign the MAAC on August 16, 2024, because on that day, she did not go to DSL's office in El Paso, Texas, was not in El Paso, and was out of town.[55]  Balderrama does not testify that on that day, she could not access the onboarding packet or her profile on DSL's system remotely from anywhere outside of DSL's office or El Paso; in fact, her own testimony (discussed in the next paragraph) suggests that she could, at a minimum, access DSL's system through her mobile phone.  As DSL points out, Balderrama does not claim that on August 16, 2024, she was unable to access the internet or her personal email account to which DSL sent her the link to the onboarding packet—whether she was in El Paso or anywhere else.  Def.'s Reply at 4, 6.  Nor does she testify that on that day, she did not in fact access the onboarding packet or any DSL system using her profile login

---

[54] *See* Leible Decl. Ex. E, at 37–38; *id.* at 39 ("Are you able to perform the essential functions of the job for which you are applying with or without a reasonable accommodation?").

[55] Pl.'s 1st Aff. at ¶ 6.

information.  The Court finds that Balderrama's testimony that she did not go to DSL's office and was out of town on August 16, 2024, does not sufficiently support her claim that she did not electronically sign the MAAC on that day.  *See Soni*, 2022 WL 1402046, at *4 (finding that plaintiff's evidence did not sufficiently support his allegation that he did not recall signing the agreement because "his own evidence undermine[d] his allegation").

Finally, Balderrama testifies that in late September 2024 (that was about two weeks after she began working at DSL), she attended a training session after which she had to electronically sign additional documents and that at that time, her supervisors instructed her to hand over her mobile phone, to give them the password to her phone, and to leave the phone logged into her profile on DSL's system—so that the supervisors could complete the training paperwork for her.[56]  So, she says, the supervisors had unrestricted access to her profile or account with the ability to access any information on the account or "to sign any document."[57]  But "the mere fact that a document *can* be falsified does not mean any given document actually *was* falsified." *Butler v. Z&H Foods, Inc.*, No. 21-20086, 2021 WL 4073110, at *2 (5th Cir. Sept. 7, 2021) (italics in original) (upholding district court's finding that the arbitration agreement's existence was not "in issue").  The Court finds that Balderrama's testimony does not sufficiently substantiate her claim that she did not electronically sign the MAAC on August 16, 2024.

In sum, the Court finds that whereas DSL has carried its burden to show that the MAAC meets all of the requisite contract elements, Balderrama has failed to carry her burden to meet the requisite "some showing," "some evidence" standard.  Consequently, the Court is satisfied that

---

[56] Pl.'s 1st Aff. at ¶ 8; Pl.'s 2nd Aff. at ¶ 11.  DSL disputes that Balderrama provided her login information to DSL.  Def.'s Reply at 7.

[57] Pl.'s 2nd Aff. at ¶ 11.

the making of the MAAC is not in issue, 9 U.S.C. § 4, and therefore, it grants DSL's motion to compel arbitration and to stay this case.

## III.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED**[58] that Defendant's Motion to Compel Arbitration of Plaintiff's Claims (ECF No. 4) is **GRANTED**.

---

[58]  The undersigned Magistrate Judge has the authority to decide DSL's motion in an order, rather than in a report and recommendation.  The Federal Magistrates Act, 28 U.S.C. § 636, "lists the following as *dispositive* pretrial matters in civil cases in which the magistrate judge may only issue a recommendation: motions for injunctive relief, for judgment on the pleadings, for summary judgment, to certify or decertify a class action, to dismiss for failure to state a claim, and to involuntarily dismiss a case."  *Davidson v. Georgia-Pac., L.L.C.*, 819 F.3d 758, 763 (5th Cir. 2016) (emphasis added) (citing 28 U.S.C. § 636(b)(1)(A)); *see also* Fed. R. Civ. P. 72 (providing that a magistrate judge may "issue a written order stating the decision" on a nondispositive matter, but "must enter a recommended disposition" on a dispositive matter).  For purposes of § 636(b)(1)(A), a motion to compel arbitration and to stay the case pending arbitration is not "'the functional equivalent of an order of dismissal,'" *cf. Davidson*, 819 F.3d. at 764 (addressing whether a motion to remand is dispositive) (quoting *In re U.S. Healthcare*, 159 F.3d 142, 145 (3d Cir. 1998) (addressing same)), because granting the motion does not "conclusively terminate[] the matter in the federal court," *cf. In re U.S. Healthcare*, 159 F.3d at 145.  As the Supreme Court has explained, "stay" in § 3 of the FAA "denote[s] the 'temporary suspension' of legal proceedings, not the conclusive termination of such proceedings," and "§ 3 ensures that the parties can return to federal court if arbitration breaks down or fails to resolve the dispute."  *Smith v. Spizzirri*, 601 U.S. 472, 477 (2024); *see also PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 14 (1st Cir. 2010) (explaining that "a stay order is merely suspensory" and even if a motion to stay litigation and compel related arbitration is granted, the court still retains authority, under the FAA, "to dissolve the stay or, after the arbitration has run its course, to make orders with respect to the arbitral award"); *accord Virgin Islands Water & Power Auth. v. Gen. Elec. Intern. Inc.*, 561 F. App'x 131, 134 (3d Cir. 2014).

Consequently, a motion to compel arbitration and to stay the case pending arbitration is not a dispositive matter, and in turn, therefore, a magistrate judge may issue a definitive order, rather than a report and recommendation, on the motion.  *See PowerShare*, 597 F.3d at 14 ("A federal court's ruling on a motion to stay litigation pending arbitration is not dispositive."); *accord Virgin Islands Water & Power Auth.*, 561 F. App'x at 134; *see also Yanez v. Dish Network, L.L.C.*, No. 1:20-CV-177, 2021 WL 4691909, at *4–*5 (S.D. Tex. Apr. 23, 2021) (Morgan, Mag. J.) (observing that "district courts in the Fifth Circuit have held that magistrate judges have the authority to decide a motion to compel arbitration, so long as no substantive claims are dismissed" and deciding the issue of arbitration as a non-dispositive pretrial matter pursuant to 28 U.S.C. § 636(b)(1)(A) (collecting cases)), *aff'd*, Order at 1 & n.1, *Yanez*, No. 1:20-CV-177 (S.D. Tex. June 2, 2021) (Rodriguez, J.) (affirming the magistrate judge's order under Rule 72(a)'s "clearly erroneous or contrary to law" standard), ECF No. 30, *aff'd*, 140 F.4th at 629 (noting that the magistrate judge granted the motion to compel arbitration and stayed the case pending arbitration).

- 19 -

**IT IS FURTHER ORDERED** that the case is **STAYED** pursuant to 9 U.S.C. § 3.[59]

**IT IS FINALLY ORDERED** that the parties must **NOTIFY** the Court of the outcome

of the arbitration proceedings within two weeks of final disposition.

**So ORDERED and SIGNED this  28th  day of January 2026.**

_____
**ANNE T. BERTON**
**UNITED STATES MAGISTRATE JUDGE**

---

[59] When a district court determines that a lawsuit is subject to arbitration, and a party requests a stay pending arbitration, § 3 of the FAA mandates that the court must stay the proceedings pending arbitration. *See Smith*, 601 U.S. at 478.